## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.**

MARCIE COOPERMAN and
RICHARD KOMAIKO,
on behalf of themselves and others similarly situated,

      Plaintiffs,

v.

DIXIE BRANDS INC.,
EUFLORA, MILE HIGH GREEN CROSS,
NATIVE ROOTS CANNABIS COMPANY, and
STARBUDS,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF PURSUANT TO THE TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. §§ 227 *et seq.*, AND CAL. BUS. & PROF. CODE § 17200 *et seq.***

### DEMAND FOR JURY TRIAL

---

Plaintiffs Marcie Cooperman ("Ms. Cooperman") and Richard Komaiko ("Mr. Komaiko") (together, "Plaintiffs"), husband and wife, bring this action against Defendants Dixie Brands Inc. ("Dixie"), Euflora, Mile High Green Cross ("Mile High"), Native Roots Cannabis Company ("Native Roots"), and Starbuds (together, "Defendants") for their roles in sending text messages in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* Plaintiffs advance the action by and through their attorneys, Foster Graham Milstein & Calisher, LLP

and Allen Vellone Wolf Helfrich & Factor P.C., and on behalf of all others similarly situated.  Plaintiffs complain and allege as follows upon personal knowledge as to their own acts and experiences, and, as to all other matters, upon information and belief, including their attorneys' investigation.

## I.   INTRODUCTION

1.   The TCPA was passed in response to voluminous consumer complaints about telemarketing abuses, in recognition that unrestricted telemarketing can be an intrusive invasion of privacy, and in order to provide some control over telemarketing practices.  *See* Pub. L. 102-243, § 2, at paras. 5, 10, 12, 13, 105 Stat. 2394 (1991); *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S.Ct. 2335, 2344 (July 6, 2020).

2.   Since the Act's passage, however, the number of telemarketing calls made to Americans has only multiplied, and unwanted calls remain the FCC's top consumer complaint.  *See*, *e.g.*, FCC, *Stop Unwanted Robocalls and Texts* (2019), https://www.fcc.gov/consumers/guides/stop-unwanted-robocalls-and-texts.

3.   Telemarketing abuses only proliferated as text messaging took hold and smart phones became ubiquitous.  *See*, *e.g.*, Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging.*, N.Y. Times, May 6, 2018; You Mail, *Robocall Index* (2019), https://robocallindex.com.

4.   This is because telemarketers, like Defendants, understand:
> Just about everyone has a mobile phone with them at all times.  Mobile phones are glued to our hip – 68 percent of us even keep our cell phones next to us while we sleep! . . . Unlike emails, most people read their text messages within a matter of minutes or even seconds. . . .  Only 23 percent of emails are read, while 98 percent of texts are opened,

and the conversion rate is 12x higher.

Baker Technologies, Inc. ("Baker"), *Should Dispensaries Use SMS Marketing?* (2019), https://www.trybaker.com/blog/should-dispensaries-use-sms-marketing; Baker, *Why Texting Is The Most Powerful Tool For Your Dispensary* (2019), https://www.trybaker.com/blog/why-texting-is-the-most-powerful-tool-for-your-dispensary.

### A.    The TCPA & Telemarketing Texts

5.    The TCPA places certain restrictions on telemarketing text messages. A text is a "call" under the Act. *See Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 667 (Jan. 20, 2016).

6.    The TCPA states:

> It shall be unlawful for any person . . . to make any call (other than a call made for emergency purposes or made with the prior consent of the called party) using any automatic telephone dialing system ["ATDS"] . . . to any telephone number assigned to a . . . cellular telephone service.

47 U.S.C. § 227(b)(1)(A)(iii).

7.    With regard to text messages, an ATDS is any equipment that has the capacity (a) to store or produce telephone numbers to be texted, using a random or sequential number generator, and (2) to dial such numbers. *See* 47 U.S.C. § 227(a)(1)(A)-(B); *Allan v. Pa. Higher Educ. Assistance Agency*, 968 F.3d 567, 572, 579-80 (6th Cir. July 29, 2020).

8.    For telemarketing texts – *i.e.*, those intended to encourage the purchase of goods or services – the "prior consent of the called party" must be express and in writing. *See* 47 C.F.R. § 64.1200(a)(1)(iii)-(2); § 64.1200(f)(1) & (12).

3

9.    Valid "prior express written consent" consists of

an agreement, in writing, bearing the signature [(including an electronic or digital form of signature valid under applicable federal or state contract law)] of the person called that clearly authorizes the [specific] seller to deliver . . . telemarketing messages using an ATDS, and the telephone number to which the signatory authorizes such . . . messages to be delivered.

47 C.F.R. § 64.1200(f)(8); *In the Matter of Rules and Regulations Implementing the TCPA of 1991*, 27 FCC Rcd. 1830, 1843, at paras. 32-33 (Feb. 15, 2012).

10.    Further, said "agreement" must

include a clear and conspicuous disclosure informing the person signing that: [b]y executing the agreement, such person authorizes the [specific] seller to deliver . . . telemarketing calls using an ATDS; and the person is not required to sign the agreement, . . . or agree to enter into such an agreement as a condition of purchasing . . . goods[] or services.

*Id*.

**B.    Defendants' Telemarketing Operations**

11.    Each of the Defendants are active in the cannabis industry.  Dixie develops and manufactures various products containing cannabis and Euflora, Mile High, Native Roots, and Starbuds operate cannabis dispensaries.

12.    Defendants have all sought to generate more revenue by employing text-based marketing.

13.    In conducting their telemarketing text campaigns, Defendants Dixie, Euflora, Mile High, and Native Roots have used Baker's products and services, including its software applications.

14.    Baker is the leading customer relationship management services

provider ("CRM") for the cannabis industry. Baker, *Home Page* (2019) https://www.trybaker.com.

15. In operating its text-based telemarketing effort, Defendant Starbuds has employed software applications like those Baker has supplied to the other Defendants.

16. Defendants' customers' information is collected using these software applications.

17. A key aspect of the telemarketing-text platform Baker has provided to Dixie, Euflora, Mile High, and Native Roots are software applications that "effortlessly collect customer information in-store and from [product makers' and dispensaries'] website[s]." Baker, *Home Page*, (2019) https://trybaker.com.

18. The applications are frequently presented to customers on tablets – *e.g.*, iPads – Defendants place in their stores and at events.

19. One such Baker supplied application run on iPads is called "Cell Checkin." Baker, *Checkin* (2019), https://www.trybaker.com/products/checkin.

20. Defendants also use other similar applications embedded in their websites and online ordering systems.

21. Baker refers to the application it embeds in online destinations, such as those belonging to and used by Defendants, as "Cell Collect." Baker, *Webinar - Dispensary Marketing: From Application to Expansion* (2019), https://www.trybaker.com/webinars/recording/dispensary-marketing-application-to-expansion?  hsCtaTracking=b23089e2-4202-48fb-a603-b3bf2146500b%7C852ff79d-

ef7a-4505-9cfd-416e5a7075b0;   Baker,   *Collect*(2019),   https://www.trybaker.com /products/collect.

22.   The aforementioned applications harvest cell phone numbers from Defendants' customers in-store, at events, and online.  Before otherwise interacting with Defendants, customers are directed to interface with these cell phone number intake applications.

23.   The applications build lists of Defendants' customers' cell phone numbers, linking them with other streams of customer information.

24.   Utilizing additional software applications, Defendants use these data-enhanced lists to send telemarketing texts – *en masse* – to their customers.

25.   Applications like Baker's "Connect," for example, which Defendants Dixie, Euflora, Mile High, and Native Roots have used, with Defendant Starbuds employing a similar application, merges data sorting functions with an ATDS, permitting Defendants to view various criteria relating to the listed cell phone numbers, and allowing them to send text messages to thousands of customers automatically.  *See* Baker, https://www.trybaker.com/products/connect.

26.   Defendants understand how vital text-based marketing is to growing their businesses.

> Text messages are a particularly important medium for the
> cannabis industry.  [C]annabis businesses specifically
> should incorporate [them] as a core component of their
> marketing strategy because many other traditional
> marketing tactics are not feasible. . . .  Depending on local
> and state regulations, as a cannabis business, you likely
> cannot advertise on vehicles, billboards, at state fairs, in
> shopping malls, or in arenas.  In California, you can only

6

>       advertise marijuana products if more than 71.6 of the
>       viewers are 21 or older.

Baker, *Should Dispensaries Use SMS Marketing?* (2019),
https://www.trybaker.com/ blog/should-dispensaries-use-sms-marketing.

27.     Defendants attempt to optimize the impact of the telemarketing texts they send, centering them around loyalty programs, focusing on customizable promotions and product notifications, and including hyperlinks to their websites and online ordering systems.

28.     Using the applications described above, Defendants have violated the TCPA by sending telemarketing text messages to the gathered numbers without obtaining valid prior express written consent from the customers who received them.

## II.     FACTUAL BACKGROUND

### A.     Defendants' Unlawful Activities Harm Plaintiffs

29.     Ms. Cooperman has received telemarketing text messages transmitted using ATDSs from Dixie, Euflora, and Starbuds.  Mr. Komaiko has received ATDS sent telemarketing texts from Defendants Mile High and Native Roots.  Neither Ms. Cooperman nor Mr. Komaiko gave valid prior express written consent to receive such communications from any of the Defendants.

#### 1.     Dixie

30.     Ms. Cooperman received telemarketing texts from Dixie between April 8, 2016 and April 4, 2018.  She was sent at least 13 such messages during that time period.  *See* Exhibit 1.

31.     The texts sent from Dixie appeared on Ms. Cooperman's cell phone as if

transmitted from four different numbers, (720) 399-7850, (833) 923-2572, (970) 387-4692, and (970) 598-0194. *See id*.

32.     The numbers the text messages appeared to be delivered from were selected to prevent them from being filtered or rejected, and to mask the use of an ATDS. This is known as "spoofing."

33.     The telemarketing texts from Dixie included content like "20% OFF any Dixie product from Lightshade w/online order when you follow this link: tbkr.co/rpq7u. Promo Code: DIXIE. REC Only. Thru 8/13. WSL" *Id*.

34.     Ms. Cooperman never provided valid prior express written consent to receive telemarketing texts from Dixie.

35.     The only instance, and the only way, in which she disclosed her cell phone number to Dixie involved her interfacing with the product maker's website, and, while doing so, Baker's Cell Collect or another similar application.

36.     Together, Ms. Cooperman's recollection and an investigation relating to a dispensary uninvolved in this action that used Baker applications to gather cell numbers, confirms her experience on Dixie's website approximately included:

   a.     Viewing a page with a text box indicating one should "login" if he or she "already [has] an account" or "sign up."

   b.     Transitioning, after clicking "sign up," to a text box asking, "What's your cell number?," providing spaces for the appropriate number of digits to be entered, and offering a "next" click-on option.

c.   Upon entering her number and clicking "next," the appearance of a new text box, requesting the entry of one's "first name, last name, and email [address]" in provided fields, along with another "next" click-on option.

d.   After inputting the requested fields and clicking "next," another text box opened, indicating, "Create a Baker password," and containing a line for the entry of such, as well as a "finished" click-on option.

e.   Subsequent to entering a password and clicking "finished," a final text box was displayed, stating, "Msg & data rates may apply. Consent is not a condition of purchase. An autodialed marketing message will be sent to the number provided. Privacy Policy Terms & Conditions." The hyperlinks provided in that statement linked to Baker's, not Dixie's, privacy policy and terms and conditions.

Exhibit 2.

37.   Completing that process would not have resulted in Ms. Cooperman providing valid prior express written consent to receive telemarketing texts from Dixie, because, among other things, it did not present a clear and conspicuous disclosure, did not bear a signature, did not specify that more than one telemarketing message would be sent, did not reference an "agreement," and did not clearly and specifically authorize Dixie to deliver such messages (*i.e.*, the disclaimer linked to

Baker's terms and conditions and privacy policy).

38.     All of the telemarketing text messages Ms. Cooperman received from Dixie were delivered using an ATDS, and, specifically, Baker's Connect application.

2.     Euflora

39.     From September 1, 2017 to February 5, 2019, Ms. Cooperman received at least 43 telemarketing texts from Euflora.  *See* Exhibit 3.

40.     These messages appeared on her cell phone as if sent from the numbers, (833) 834-6422, (833) 923-2705, (970) 414-4257, and (970) 535-2519.  *See id.*

41.     The texts appeared to be sent from those numbers to prevent them from being filtered or rejected, and to disguise the use on an ATDS.

42.     The telemarketing texts from Euflora included content such as "Don't let Wax Wednesday pass you by!  20% off all Wax, Shatter, Kief, and Live Resin[.] Wednesdays ONLY! . . .  https://tbkr.co/ce-p1h8;" and "HAPPY HALLOWEED from EUFLORA WEAR YOUR COSTUME get a FREE GRAM OF KIEF w/$25 purchase (pre-tax) thru Oct 31 @ Euflora 16th St. Mall[.]  While supplies last."

43.     Ms. Cooperman visited Euflora only one time, doing so in person in April 2016.

44.     During her visit, she interfaced with a tablet employing Baker's Cell Checkin or another similar application.

45.     Based on her recollection and a documented experience of hers with another dispensary unnamed in this suit, this interaction consisted approximately of the following:

a.   Viewing a page on the tablet with Euflora's logo at the top and Baker's at the bottom, and stating, "Welcome to Euflora.  Tap to start earning points for discounts and rewards."

b.   After "tapping," another page on the tablet was transitioned to. This page showed the Euflora and Baker logos at its top and bottom, respectively, a number keypad, and stated, "Enter your cell number."  At the bottom of the page, above the Baker logo, in relatively small size, the following language was displayed: "Message and data rates may apply.  Click here for [Terms and Conditions (]ToCs[)].  Consent is not a condition of purchase.  An autodialed marketing message will be sent to the number provided.   No purchase necessary.   Information collected in connection with this program will be used in accordance with the Baker Privacy Policy."  Hyperlinks provided access to the terms and conditions and privacy policy.  Those documents related to Baker, not Euflora.

c.   Upon her cell phone number being inputted, a new page was called forth.  This page again had the Euflora and Baker logos positioned at the top and bottom of the page.  The page also displayed a number of discount options and stated, "Tap a reward to redeem."  Finally, the page included a "Log Out & Save My Points" touch option.

d.   Pressing the Baker logo that appeared on the pages opened a separate page, which stated, "Baker.   Baker is the leading software partner for dispensaries across the country.   Visit trybaker.com or email us at info@trybaker.com for more information!"

Exhibit 4.

46.    This process did not result in Ms. Cooperman's provision of valid prior express written consent to receive telemarketing texts from Euflora, because, among other reasons, it did not present a clear and conspicuous disclosure, did not bear a signature, did not specify that more than one telemarketing message would be sent, did not reference an "agreement," and did not clearly and specifically authorize Euflora to deliver such messages (*i.e.*, the disclaimer referenced Baker, and linked to Baker's terms and conditions and privacy policy).

47.    The only instances, and the only way, in which Ms. Cooperman disclosed her cell phone number while visiting Euflora involved her entering it into the application described above.

48.    She did not interact with Euflora in any way, including online, other than during her one April 2016 physical visit to the dispensary.

49.    Ms. Cooperman never provided valid prior express written consent to receive telemarketing text messages from Euflora.

50.    All of the telemarketing texts she received from Euflora were sent using an ATDS, and, specifically, Baker's Connect application.

3.    <u>Mile High</u>

51.    Mr. Komaiko received telemarketing texts from Mile High between June 18 and September 13, 2016.  He was sent at least 13 such messages during that time period.  *See* Exhibit 5.

52.    The texts sent from Mile High appeared on Mr. Komaiko's cell phone as if transmitted from three different numbers, (720) 463-2220, (720) 580-5535, and (303) 647-5536.  *See id.*

53.    These "spoofed" numbers were used to prevent the text messages from being filtered or rejected, and to obscure the use of an ATDS.

54.    The telemarketing texts from Mile High included content like "Mile High Green Cross 852 Broadway – MHGC. Sale! Recreational $150 Oz. Out the door. Select Strains. While supplies last." *Id.*

55.    Mr. Komaiko incurred charges from his cellular carrier, Verizon Wireless, for receiving at least one of the telemarketing texts sent from Mile High while he was in Morocco.  These charges amounted to several cents.  The charges were separate from Mr. Komaiko's "unlimited plan" and related uniquely to his receipt of Mile High texts.  *See* Exhibit 6.

56.    Mr. Komaiko has visited Mile High only once.  He did so in person in April 2016.

57.    During this visit, he interfaced with a tablet or computer employing Baker's Cell Checkin, Cell Collect, or another similar application approximating those described above at paragraphs 36 and 45.

58.     Mr. Komaiko entered his cell number into this application.  That is the only time at, and the only way in, which he conveyed his cell number while visiting Mile High.

59.     Mr. Komaiko did not have occasion to interact with Mile High in any capacity, including online, after his lone April 2016 visit.

60.     He never gave valid prior express written consent to receive telemarketing texts from Mile High.

61.     Yet, Mile High sent him numerous telemarketing texts.

62.     All of those text messages were delivered to Mr. Komaiko using an ATDS, and, specifically, Baker's Connect application.

        4.     <u>Native Roots</u>

63.     Mr. Komaiko received at least one telemarketing text from Native Roots on October 13, 2016 and a second on April 20, 2020.  See Exhibit 7.

64.     On his cell phone, it appeared as if the texts were sent from the numbers (720) 399-1301 and (213) 429-2622, respectively.  *See id.*

65.     The numbers the messages appeared to be delivered from were chosen to prevent the texts from being filtered or rejected, and to conceal the use of an ATDS. The messages from Native Roots stated: "Welcome to online ordering at Native Roots Boulder! Visit our online menu for availability, pricing, and photos here: http://tbkr.com/nrb - powered by Baker;" and "(Native Roots) Great holiday specials on all product categories! Stop by, give us a call, or visit the deals page on our website for details. . . ." *Id.*

66.     Mr. Komaiko has visited Native Roots' only once, doing so in person in April 2016.

67.     While in the dispensary, he interfaced with a tablet or computer running Baker's Cell Checkin, Cell Collect, or another similar application approximating those described *supra* at paragraphs 36 and 45.  He inputted his cell number into the application.

68.     That is the only time at, and the only manner in, which Mr. Komaiko conveyed his cell number while interacting with Native Roots.

69.     Mr. Komaiko did not interact with Native Roots in any capacity, including online, after making his one April 2016 visit.

70.     He never provided valid prior express written consent to receive telemarketing texts from Native Roots.

71.     Despite that, Native Roots sent him telemarketing messages using an ATDS, and, specifically, at least with regard to the message he received in October 2016, Baker's Connect application.

5.     Starbuds

72.     From April 19, 2016 to July 27, 2019, Ms. Cooperman received at least 56 telemarketing texts from Starbuds. *See* Exhibit 8.

73.     These messages appeared on her cell phone as if sent from various numbers, including (833) 899-1943, (877) 205-7981, (877) 238-0345, and (877) 238-0463.  *See id*.

74.     Those numbers were selected to appear as "sent from" numbers to

prevent the texts from being filtered or rejected, and to hide the use of an ATDS.

75.    The telemarketing texts sent to Ms. Cooperman from Starbuds contained content such as "Starbuds: Happy 7/10, Marcie!  Today only, enjoy 30% off select concentrates.   Come into Starbuds to enjoy this exclusi[v]e discount. . . .;" "Starbuds: Happy Veterans Day!  Veterans w/ ID get 30% off full price items.  All others get buy 1 get 1 half off select edibles.  Rec only 11/11. . . .;" and "Starbuds: Happy Mother's Day to all moms!  $99 selected OZ & $45 CSC 500 mg dist[i]llate vape carts.  [V]alid 5/14 Rec Only  . . . ."  *See id.*

76.    She has visited Starbuds only once, doing so in person sometime in April 2016.

77.    While at the dispensary, she interfaced with a tablet or computer employing an application similar to Baker's Cell Checkin or Cell Collect and comparable to that described above at paragraphs 36 and 46.

78.    Ms. Cooperman entered her cell number into the application.  That is the only time at, and the only way in, which she conveyed this number during her visit to Starbuds.

79.    With the exception of responding "STOP" after receiving a telemarketing text from Starbuds on October 18, 2018, she has never had any interaction with Starbuds, including online, other than during her April 2016 visit.

80.    Starbuds continued sending Ms. Cooperman telemarketing text messages after she responded "STOP."  *See id.*

81.    She never provided valid prior express written consent to receive

telemarketing texts from Starbuds.

82.     Each of the telemarketing texts she received from Starbuds was sent using an ATDS.

**B.      Parties**

83.     Plaintiff Marcie Cooperman is a resident of Los Angeles, California.  She received all of the text messages sent to her relevant in this action at cell phone number (913) 908-4204.  That number was assigned to a cellular telephone service, Verizon Wireless, which, in turn, designated it to Ms. Cooperman, at all times relevant to this action.

84.     Plaintiff Richard Komaiko is a resident of Los Angeles, California.  He received all of the text messages sent to him relevant in this action at cell phone number (708) 370-3139.  That number was assigned to a cellular telephone service, Verizon Wireless, which, in turn, designated it to Mr. Komaiko, at all times relevant to this action.

85.     Defendant Dixie Brands Inc. is a Delaware corporation with its headquarters located in Denver, Colorado.

86.     Defendant Euflora is a Colorado limited liability company with its headquarters located in Aurora, Colorado.  Euflora also operates a retail facility in Long Beach, California.

87.     Defendant Mile High Green Cross is a Colorado limited liability company with its headquarters located in Denver, Colorado.

88.     Defendant Native Roots Cannabis Company is a Colorado limited

liability company with its headquarters located in Denver, Colorado.

89.    Defendant Starbuds is a Colorado limited liability company with its headquarters located in Denver, Colorado.  Starbuds also operates retail facilities in Maryland and Oklahoma.

### III.    JURISDICTION AND VENUE

90.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because the action involves the TCPA.

91.    This Court also has original jurisdiction under 28 U.S.C. § 1332, as the amounts in controversy exceed the specified thresholds and the action is between diverse parties.

92.    Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over the UCL claim raised, because it relates to the TCPA claim to a great extent.

93.    This Court has personal jurisdiction over Defendants because they reside and conduct significant amounts of business in the District of Colorado, and because the unlawful conduct giving rise to this action occurred in, was directed to, and/or emanated from the District of Colorado.

94.    Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to Plaintiffs' claims occurred in the district.

## IV.   CLASS ACTION ALLEGATIONS

95.    Plaintiffs reallege and incorporate by reference herein all allegations previously made in paragraphs 1-95 above.

96.    This class action is brought and may be maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure, Rule 23 of the Colorado Rules of Civil Procedure, and Section 382 of the California Code of Civil Procedure.

97.    Three proposed Classes are defined as follows:

a.    All persons in the United States and its Territories to whom Defendants sent one or more telemarketing texts utilizing an ATDS, where the recipient number used to deliver the text/s was entered into a number collection application prior to such a transmission, at any time in the period that begins four years from before the date of this complaint's filing to trial.

b.     All persons in the United States and its Territories to whom Defendants sent one or more telemarketing texts from within the State of Colorado utilizing an ATDS, where the recipient number used to deliver the text/s was entered into a number collection application prior to such a transmission, at any time in the period that begins three years from before the date of this complaint's filing to trial.

c.    All persons in the State of California to whom Defendants sent one or more telemarketing texts utilizing an ATDS, where the

recipient number used to deliver the text/s was entered into a number collection application prior to such a transmission, at any time in the period that begins four years from before the date of this complaint's filing to trial.

98.   Specifically excluded from the proposed Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them.

99.   The Judge assigned to this action and any member of the Judge's immediate family are also specifically excluded from the proposed Classes.

100.   The Class definitions may be expanded or narrowed by amendment or amended complaint as additional information is obtained through further investigation and discovery.

101.   The Classes are so numerous that joinder of all the members is impracticable.  Plaintiffs do not know the exact number of members in each Class but they reasonably believe each group to be in the several thousands.  Class members should be readily identifiable through records Defendants maintain.

102.   The disposition of the claims of the Classes in a single action will provide substantial benefits to all parties and the Court.

103.   There are several well defined questions of law and fact common to

Plaintiffs and the Class members.  Some of these common questions are:

a.   Whether Defendants violated the TCPA by sending non-emergency, unconsented to telemarketing texts to any cell numbers using ATDSs?

b.   Whether the cell number intake applications Defendants used obtained customers' valid prior express written consent to receive autodialed telemarketing texts specifically from Defendants?

c.   Whether Defendants systematically sent unconsented to telemarketing text messages to persons using ATDSS?

d.   Whether members of the Classes suffered economic injury as a consequence of Defendants' actions?

e.   Whether the Class members are entitled to statutory damages?

f.   Whether the members of the Classes are entitled to treble damages because Defendants acted knowingly and/or willfully?

g.   Whether Class members are entitled to restitution?

h.   Whether the Class members are entitled to injunctive relief?

104.   As persons who received numerous unconsented to telemarketing texts from Defendants after interfacing with their cell phone number intake applications, Ms. Cooperman's and Mr. Komaiko's claims are typical of those of the members of the Classes in that they arise from Defendants' common course of conduct and are based on the same legal and remedial theories.

105.   Ms. Cooperman and Mr. Komaiko will fairly and adequately represent

and protect the interests of the Classes.

106.   Plaintiffs have retained competent and experienced counsel who have significant experience in complex, mass, and class action litigation, including consumer actions.

107.   Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class members.

108.   Neither Plaintiffs nor their counsel have interests that are contrary to or are antagonistic to those of the members of the Classes.

109.   Defendants have engaged in a common course of conduct towards Plaintiffs and the Class members.  The common issues arising from this conduct that have impacted Plaintiffs and the members of the Classes predominate over any individual issues.

110.   A class action is the superior method for the fair and efficient adjudication of this controversy.

111.   The interest of individual members of the Classes in independently controlling the prosecution of separate claims against Defendants is small because the damages and restitution figures available in an individual action for violation of the TCPA and UCL are small.

112.   Here, class treatment is superior to multiple individual suits or piecemeal litigation because it will conserve judicial resources, promote consistency and efficiency of adjudication, provide a forum for small claimants, and deter illegal activity.

113.    No unusual difficulties relating to the management of this case as a class action present themselves.

## V.    CAUSES OF ACTION

### First Cause of Action
### (Violations of the TCPA, 47 U.S.C. § 227 *et seq.*)

114.    Plaintiffs reallege and incorporate by reference herein all allegations previously made in paragraphs 1-114 above.

115.    Defendants Dixie, Euflora, and Starbuds sent telemarketing texts to Ms. Cooperman without her prior express written consent, violating the TCPA, and causing her cognizable harm.  *See* 47 U.S.C. § 227(b)(1)(A)(iii).

116.    Defendants Mile High and Native Roots sent telemarketing text messages to Mr. Komaiko without his prior express written consent, violating the TCPA, and causing him cognizable harm.  *See id.*

117.    Defendants sent telemarketing text messages to other members of the Classes without their prior express written consent, violating the TCPA, and causing them cognizable harm.  *See id.*

118.    The foregoing acts and omissions of Defendants constitute numerous and multiple negligent, and knowing and/or willful, violations of the TCPA, including but not limited to each and every one of the above-cited provisions of 47 U.S.C. § 227 *et seq.*

119.    As a result of the negligent violations, Plaintiffs and the members of the Classes are entitled to an award of $500.00 in statutory damages for each and every

such violation.  47 U.S.C. § 227(b)(3)(B).

120.   As a result of the knowing and/or willful violations, Plaintiffs and the members of the Classes are entitled to an award of $1,500 in statutory damages for each and every such violation.  47 U.S.C. § 227(b)(3)(B)-(C).

121.   Plaintiffs and the members of the Classes are also entitled to and seek injunctive relief prohibiting such conduct in the future.  47 U.S.C. § 227(b)(3)(A).

**Second Cause of Action**
**(Violations of the UCL, Cal. Bus. & Prof. Code § 17200 *et seq*.)**

122.   Plaintiffs reallege and incorporate by reference herein all allegations previously made in the paragraphs above.

123.   The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

124.   Defendants have contravened the UCL prohibition against engaging in "unlawful" acts and practices by, as set forth above, violating the TCPA, which constitutes a violation of California Business and Professions Code Section 17200.

125.   The foregoing acts and omissions of Defendants also constitute "unfair" business acts and practices under the UCL, being substantially injurious to consumers; offensive to public policy; immoral, unethical, and oppressive; and unscrupulous, as the conduct's gravity outweighed its benefits.  Defendants' actions, moreover, are sufficiently tethered to a violation of the TCPA.

126.   Plaintiffs allege violations of consumer protection laws, as recounted above, resulting in harm to consumers.  Plaintiffs also describe above acts contrary

to public policy relating to competition and conduct towards consumers.

127. There were reasonable alternatives available to further Defendants' legitimate business interests – *i.e.*, alternatives to the conduct described *supra*.

128. Defendants' conduct caused substantial harm to Plaintiffs and other members of the Classes. Mr. Komaiko, and likely other Class members, have suffered economic injury in the form of additional cell service charges because of Defendants' actions.

129. Defendants have engaged in unlawful and unfair business acts, entitling Plaintiffs and the California Class to equitable relief.

130. Plaintiffs and the members of the California Class are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## PRAYER

Plaintiffs, on behalf of themselves and the Class members, pray for the following relief:

a. Certification of the Classes;

b. Appointment of Plaintiffs Marcie Cooperman and Richard Komaiko as Class representatives;

c. Appointment of the law firms representing Plaintiffs as Class counsel;

d. An award of statutory damages;

e. Treble damages according to statute;

f. Restitution for any economic loss;

g. An injunction barring Defendants from engaging in the illegal

conduct described herein;

h.      Attorneys' fees and costs; and

i.      Any other relief that this Court deems just.

Respectfully submitted,

s/ Jordan Factor
Jordan Factor, No. 38126
James S. Helfrich, No. 22627
Brenton L. Gragg, No. 52528
ALLEN VELLONE WOLF HELFRICH & FACTOR P.C.
1600 Stout Street, Suite 1900
Denver, CO 80202
Telephone: (303) 534-4499
jfactor@allen-vellone.com
jhelfrich@allen-vellone.com
bgragg@allen-vellone.com

Daniel K. Calisher, No. 28196
Steven J. Wienczkowski, No. 33105
FOSTER GRAHAM MILSTEIN & CALISHER LLP
360 South Garfield Street, 6th Floor
Denver, CO 80209
Telephone: (303) 333-9810
calisher@fostergraham.com
swieczkowski@fostergraham.com

Peter Roldan (admission pending)
Jason Fisher (admission pending)
EMERGENT LLP
5 Third Street, Suite 1000
San Francisco, CA 94103
Telephone: (415) 894-9284
peter@emergent.law
jason@emergent.law

ATTORNEYS FOR PLAINTIFFS